IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DUSTI THOMPSON, Individually, On Behalf of the Estate of Scott Thompson, Deceased, and on behalf of All Wrongful Death Beneficiaries | § § § § § | |
| Plaintiff | § § | |
| | § | CIVIL ACTION NO. 3:20-cv-2170-L |
| vs. | § § | |
| WING ENTERPRISES, INC., d/b/a LITTLE GIANT LADDERS, and HAROLD ARTHUR WING | § § § § | |
| Defendants | § | JURY DEMANDED |

**JOINT PRETRIAL ORDER**

Pursuant to this Court's orders, Federal Rules of Civil Procedure 16, and Local Rule 16.4, Plaintiff Dusti Thompson, Individually, On Behalf of the Estate of Scott Thompson, Deceased, and On Behalf of All Wrongful Death Beneficiaries ("Ms. Thompson" or "Plaintiff") and Defendant Wing Enterprises, Inc. ("Wing" or "Defendant") submit this proposed Joint Pretrial Order:

1.  **Counsel for the Parties:**

    A.  <u>Plaintiffs' counsel:</u>

    M. Ross Cunningham
    Joseph Alexander
    David Denny
    Cunningham Swaim, LLP
    4015 Main Street, Suite 200
    Dallas, Texas 75226
    Telephone:   (214) 646-1495
    Facsimile:   (214) 613-1163

1

   B.  <u>Defendant's counsel:</u>

    Carlos Balido
    Anastasia Triantafillis
    Walters, Balido, & Crain
    10440 North Central Expressway, Suite 1500
    Dallas, Texas 75231
    Direct Telephone: (214) 204-2266
    Main Telephone: (214) 204-2100

**2.**  **Statement of Jurisdiction:**

This Court has diversity jurisdiction under 28 USC §1332 because the citizenship of the parties is diverse and because the amount in controversy exceeds $75,000.

**3.**  **Nature of the Action:**

On December 29, 2019, Mr. Scott Thompson fatally fell while using a Little Giant Xtreme M22 ladder. At the time, he was removing Christmas lights from a client's house, and his wife Dusti Thompson was working with him. Mr. Thompson's fall and death were caused by a defective Ladder that was designed, manufactured, marketed and sold by Defendant Wing Enterprises. Plaintiffs are the Estate of Scott Thompson and the wrongful-death beneficiaries of Scott Thompson. Plaintiffs seek economic, non-economic, punitive damages, and trebling under the Texas Deceptive Trade Practices Act.

Defendant has denied liability, disputes damages, and alleges affirmative defenses.

**4.**  **A summary of the claims and defenses of each party:**

   A.  <u>Plaintiffs:</u>

Scott and Dusti Thompson were a husband and wife that lived in Rockwall, Texas and worked together in several small businesses, including a business that seasonally installed and removed Christmas tree lights for clients. In early 2017, Scott and Dusti saw an ad for a Little Giant ladder on TV, specifically touting the functionality and safety of the Xtreme model ladder. They were immediately impressed by the represented functionality of the ladder and, importantly, its purported safety. In reliance upon statements made by Wing in the TV ad and on the statements and representations on Wing's website, they purchased a 22-foot Xtreme multi-purpose ladder (Part Number 2322-801, Model Number 22) on February 2, 2017 (the "Ladder") and had it shipped directly to their home in Rockwall, Texas.

The Ladder, which was manufactured by Wing's Chinese vendor, Suzhou Zhongchuang Aluminum Products Co., Ltd. ("Zcal"), was riddled with defects that ultimately caused the Ladder to fail while Scott Thompson was using it. The defects included, without limitation:

- The outer channels exceeded their permissible tolerances and did not comply with their design;
- The outer channels were too soft and did not comply with their design;

- The back brace was too soft and did not comply with its design;
- The welds for the back brace were of poor quality and not done correctly, such that they were weaker than they should have been, without the proper penetration and fusion required of such welds;
- The welds for the back brace were too soft;
- The welds for the back brace were improperly designed;
- The welds for the back brace were improperly welded;
- The outer channels for the accident ladder were made at a facility that, during the relevant times, systematically manufactured outer channels that exceeded their permissible tolerances, which caused Wing to recall other models of ladders. Unbelievably, Wing did not recall this ladder despite it, too, being out of tolerance;
- The design of the Rock Lock pin had been shortened by 0.050" over the years, which reduced the depth of the insertion into the inner channel; and,
- The warnings and labels were deficient because they would not alert consumers to the above defects, give them the necessary information to discover the above defects, or otherwise properly direct consumers to take ladders such as the accident Ladder out of service.

Prior to selling the ladder to the Thompsons, Wing knew Zcal was manufacturing ladders with the above defects (and more). Three months before the Thompsons' Ladder was manufactured, an internal email advised Art Wing (the CEO of Little Giant) that Zcal was not properly welding the back braces and was using non-conforming back braces. This was a significant problem. As admitted by Wing's corporate representative and Director of Engineering, Brian Russell, the back brace is a structural component. The fact that the back-brace welds were not properly penetrating the back-brace metal create instability in the ladder, and it can create a failure. Wing is unable to explain why these welding defects occurred.

Just 8-weeks before the Thompsons's ladder was manufactured, Wing issued a Discrepant Material Report because it discovered that Zcal was making Xtreme model outer channels with aluminum that was dangerously soft. Wing discovered that Zcal was not checking the hardness of the aluminum they were using despite certifying that it was. Despite Wing's knowledge of these issues it let Zcal continue to churn out ladders and Zcal manufactured the Thompsons's Ladder during the second week of October 2016 even though it had not rectified its dangerous and sloppy manufacturing processes.

Further, two months after Zcal made the Thompsons's Ladder, but before it had been shipped to America, Wing discovered that Zcal was making the outer channel utilized on the Xtreme, Velocity, Liberty, and LT ladders during the entire year of 2016 out of tolerance (too wide). This caused the Rock Locks to "disengage" at a disturbingly high rate of 41%. Shockingly, Wing admitted that they never got to the bottom of what was causing this defect, nor when the defective manufacturing started. Even today, Wing's Head of Engineering does not know why Zcal made the outer channels too wide. Not only did Wing never figure out "how" the manufacturing defect crept into two, separate Chinese plants but it also never figured out "when" it started.

The Thompsons's Ladder was made by Zcal at the exact time Zcal was making defective outer channels. And the Thompsons's Ladder contained this same defect, which is not surprising because

the outer channels of the Xtreme model ladder were identical (15" max width) to those of the Velocity, Liberty, and LT model ladders.

Wing issued a Consumer Product Safety Commission ("CPSC") Recall for all Velocity, Liberty, and LT model ladders made in China during 2016. In its official Report to the CPSC, Wing admitted that the defect was that the width of the Outer Channel was too wide, which created a hazard:

> As initially reported to the CPSC on February 6, 2017, Wing Enterprises determined that the products identified below, which were manufactured during the period December 10, 2015 to December 16, 2016 may contain a "defect which could create a substantial product hazard" as defined in subsection (a)(2) of Section 15. On February 6, 2017, Wing

> The defect is the result of outer sections being manufactured outside design tolerance specifications +/- 30/1000". Wing Enterprises performed sample tests on 2,794 ladders in inventory and could cause the Rock Locks to disengage in forty-one percent of the ladders.

What is most disturbing is the fact that this was the exact problem, from the exact Chinese factory, exactly 4-years earlier:

> As initially reported to the CPSC on October 25, 2012, Wing has determined that the products identified below, which were manufactured during the period June 10, 2012 to July 15, 2012 may contain a "defect which could create a substantial product hazard" as

> Wing discovered that a small number of the Switch-it ladders came from the manufacturing facility with a manufacturing defect. The defective units have a measurement across the top of the outer that is too wide (up to 12.75" rather than the specified 12.175"). See Exhibit 4A for technical drawings. As a result, under

Although Wing admitted to CPSC that the defect was because the outer channels were manufactured too wide by Zcal, that is not what Wing told the public. Instead, Wing told the public that the problem was limited to the style of Rock Lock that was used. Despite its knowledge, Wing never mentioned the real defect—the width of the outer channels.

In short, the Thompsons' Ladder had the same vendor, the same time frame, and the same defect as the Recalled ladders; yet, Wing sold the Thompsons their Xtreme ladder. And Wing not only sold a knowingly defective ladder, but it told the Thompsons their ladder was "safe to operate" as long as it was not a Velocity, Liberty, or LT ladder made with Rock Lock 2.0.

Wing did not just hide the real defect from customers like the Thompsons—it actively encouraged them to use ladders it knew were defective. By focusing on the style of Rock Lock, Wing avoided addressing the defective nature of the outer channels, which would have required the recall of 10s of 1000s of additional ladders.

On January 23, 2017, just one week before Wing sold the Thompsons their Ladder, Wing issued a Discrepant Material Report because Zcal was not inspecting the ladders it was making. The next day, Wing sent an email to Zcal expressing its frustration because of the "high volume of quality defects" in ladders coming out of that plant and getting in the hands of consumers.

Wing's "conscious" indifference to these defects is directly applicable to this case because the Thompsons's Ladder has been found to be out of tolerance – just like the recalled ladders. As confirmed through laboratory testing, the Thompsons's Ladder was "too wide" by a factor of more than 3x the maximum allowed.

Although Wing routinely sent emails to China feigning concern over customer perception and litigation costs, it did not express any concern for the safety of its customers. And, despite knowing that Zcal was making defective ladders, and not inspecting them, Wing did nothing to prevent the Ladder—which had the same defect as the recalled ladders—from being sold to the Thompsons.

On February 2, 2017, Wing sold the defective Ladder to the Thompsons. The Thompsons bought the Ladder after watching an informercial, which touted the safety and reliability of the Ladder. Notably, while Wing was just days away from notifying the CPSC of ongoing manufacturing and quality issues at Zcal that were so serious as to warrant a recall, Wing continued to air infomercials claiming the Xtreme was the "safest in the world" and Wing's website continued to represent to the Thompsons and to the public that Wing's primary concern was the safety of its users:

> Hal and Brigitte Wing built their company and their people on a strong foundation, a guiding principle that every rung, every rivet, and every weld matters, because every person matters. This principle is the reason Little Giant continues to innovate and improve climbing equipment today. Many have asked us why we invest so much into research and development. Our simple answer is that we are in business to prevent injuries and save lives.
>
> Every day nearly 2,000 people are injured while using a ladder. Nearly 100 of them suffer a long-term or even permanent disability. And every day, one person dies, never returning home to family and friends. These numbers are staggering when you think of each individual's life, and especially the people who love them and are left behind.*

Little did the Thompsons realize that, to Wing, this nonsense was just advertising puffery and not a true "guiding principle."

On December 29, 2019, in between the Christmas and New Year's holidays, Mr. Thompson used the Ladder to remove Christmas lights from a client's house. While the Ladder was in the extended position, Mr. Thompson climbed the Ladder to reach the Christmas lights on the roof. The welds on the back braces gave out, the outer rails lost their stability and flared open, and the Rock Lock pins disengaged. The Ladder collapsed causing Mr. Thompson's fall. Mr. Thompson fell face-first onto the concrete driveway. After making sure 911 was called, Dusti held Scott's head while they waited for the ambulance. She rode with him while he was taken the hospital. For 5-days, Scott received emergency brain surgeries and critical care in an effort to save him from the fall-related injuries. Dusti was with him every day as he struggled to overcome the trauma. He lived for five 5 days before finally dying in front of his family.

This was avoidable. Before selling the Ladder to the Thompsons, Wing was aware that Zcal was manufacturing defective ladders. Despite this, Wing did nothing to prevent the defective Ladder—which contained the same defects that Wing knew about—from reaching the Thompsons. Instead, Wing continued to pump infomercials that enticed the Thompsons to purchase their Xtreme Ladder. Unfortunately, this resulted in the tragic death of Scott Thompson. Wing's conscious indifference is what caused Scott's death.

Plaintiffs' experts will testify that the above-mentioned defects existed in the Thompsons' Ladder and that this caused the accident.

- The Ladder's aluminum was too soft, making the outer channels weak and subject to torsion;
- The bases of the Rock Locks had extensive porosity and dross/entrained defects, which allowed the Rock Locks pins to be deflected from their designed perpendicular path and which reduced the pins' ability to properly engage;
- The Ladder's outer channels were too wide and exceeded their design, which reduced the engagement of the Rock Lock pin;
- The welds for the back braces were deficient and defective due to a lack of prior cleaning of the aluminum, contained excessive porosity, and had inadequate penetration into the back brace and parent material making the attachment point for the back braces weak;
- The weld failures allowed the outer channels to splay open, which further decreased the Rock Lock pins' engagement.
- The welds as-designed for the back brace attachments were improper and defective;
- The welds as-created were improper and defective;
- The welding process used was improper and defective because the to-be-welded areas were not cleaned or treated prior to welding;
- There were no inspections or inadequate inspections of the welds;
- The Chinese welders were not properly certified or trained, and the conditions of the welds confirms that they were not;
- Wing had no welding procedures or inspection procedures for welded joints until more than a year after the Ladder was manufactured;
- Wing was not following its Quality Manual regarding weld-related documentation and processes.
- Mr. Thompson's accident was preventable;
- The Ladder posed an unacceptable risk of injury to Mr. Thompson and its dangers outweighed its benefits;
- Although Wing has indicated it relies on ANSI A14.2 compliance for ladder safety, it produced no documentation showing that it adequately considered possible ladder failure modes in the Xtreme M22's design as suggested in ANSI/ASSE Z590.3 Prevention through Design;
- Wing's documents do not show that the Xtreme M22 met the requirements of ANSI A14.2–2007;
- Although Wing purports that its ladders are safe because they are designed to comply with ANSI standards, designing to meet ANSI A14.2 does not inherently create a safe ladder;
- While it addresses portable metal ladders in general, ANSI A14.2–2007 does not specifically address articulating extendable ladders;
- Because Wing self-certified its supposed ANSI A14.2 design verification testing and compliance, Wing could selectively choose which tests to conduct, bypassing some of the standard's requirements;
- The failure of the back brace in the Ladder's upper outer section allowed the upper

6

- section's C-channel outer rails to flex outward, reducing or eliminating the Rock Lock locking pin engagement in the upper outer section;
- The back brace on the back of the Ladder's outer section was the primary means to limit outward deformation of the Ladder's outer channels;
- The dimensional tolerances in Wing's design drawings allow the potential for little locking-pin engagement and, as designed, the Xtreme model ladder possesses little ability to accommodate out of tolerance conditions such as occurred in the Ladder;
- The width of the upper outer section of the Ladder was out of design specification and led to reduced locking pin engagement;
- The Ladder's outer section rails were out of specification for material hardness, leading also to lower material strength and increased deformation, worsening the problem of inadequate locking pin engagement;
- The ladder is not overloaded even at an initial 60° inclination angle and can withstand imposed loads in excess of Mr. Thompson's reported weight;
- The significant bowing and bending of the ladder exerts significant stress at the location where the outer and inner ladder sections overlap;
- The danger of inadequate or no locking pin engagement is exacerbated by the inability to view the locking pin once the Rock Lock has been closed, which prevents the user from being able to detect this issue;
- Wing's lack of documentation for its designs, design changes, testing, and compliance violates engineering best practices.
- The evidence shows that Mr. Thompson, based on a reasonable effort to follow Little Giant's inspection procedures, reasonably concluded that the ladder was safe to use;
- The evidence shows that Mr. Thompson was attentive to information available from Little Giant (i.e., he read the labels and use instructions); that he regularly inspected the Ladder, including on the day of the accident; and that, in Dusti's opinion, the Ladder appeared to be intact and in working order;
- Any inspection according to the instructions provided by Little Giant may result in users either not detecting certain wear and tear or concluding that observed wear and tear does not require taking the Ladder out of service based on their assessment of its structural and functional implications;
- Little Giant's inspection procedures provide no practical way for users to identify the various manufacturing and design defects that other experts have identified as leading to this accident.

Wing's gross negligence is well-established. For example, just two months before allowing Zcal to make the Thompsons' Ladder, Wing knew that factory was making ladders with welding defects that were <u>not</u> getting caught by inspections that were <u>not</u> being performed. Wing admits that failures with the back-brace welds can cause serious injury and death. The Thompsons' Ladder had this defect in it, which directly caused Scott Thompson's death. Wing also knew that Zcal was aluminum that was too soft and that it did not meet the hardness criteria.

In 2012, four years before the Thompsons' Ladder was made, Wing discovered that Zcal was making ladders with outer channels that were too wide, which was causing Rock Locks to disengage. Even after the expense and scrutiny that comes with a recall, the Zcal plant continued

7

to fabricate ladders that were out of tolerance. In August 2015, one year before the Thompsons's ladder was made, Wing chastised Zcal for its poor tooling. Despite repeated emails demanding change, nothing happened. In May 2016, Wing once again told Zcal their workmanship was totally unacceptable.

Again, and again, and again, Wing told the Chinese plants that virtually everything they did was unacceptable, out of tolerance, incorrect, and falsified. Yet, Wing just kept on using the Chinese plants to make more, and more, and more ladders. Less than two months before the Thompsons's Ladder was made, and despite complaining about defects in virtually every aspect of its manufacturing process, Wing decided that it needed to put some "C-level pressure" on Zcal to increase production volume and speed.

After the Thompsons' Ladder had been made (October 2016), but before it had been purchased or shipped (February 2017), Wing again became aware that Zcal was making ladders with outer channels that were too wide and that this defect allowed the Rock Locks to disengage (December 2016). Wing understood that this defect could cause users to "lose their balance or fall." The Thompsons' Ladder had this defect, and this defect caused or contributed to Scott Thompson's death. Brian Russell and Art Wing testified that all articulating ladders were assembled using the same assembly jigs that were responsible for the outer channels being out of tolerance – including the recalled ladders as well as the Xtreme.

Each of these defects were present in the Thompsons's Ladder. Wing knew that its ladders were being made with these defects before making and selling the Ladder to the Thompsons. And Wing knew and appreciated that these defects could cause serious injuries and death. Despite this, Wing did nothing to prevent the defect-laden Ladder from being sold to the Thompsons.

Plaintiffs bring survival claims for the physical, emotional, and economic damages to Scott Thompson before his death and to his estate due to his death, including without limitation damages for medical expenses, paining and suffering, mental anguish, funeral expenses, exemplary damages, and all other damages and amounts allowed by law.

Plaintiffs also bring wrongful-death claims. Dusti Thompson sues individually and on behalf of all other wrongful-death beneficiaries, including Kaitlyn Thompson, for the wrongful-death of Scott Thompson, including damages for, without limitation, loss of services, loss of earnings, future support, advice, care and maintenance, mental anguish, loss of companionship and society, loss of consortium, exemplary damages, loss of inheritance, and all other damages and amounts allowed by law.

Plaintiffs have sued for strict products liability (design, manufacturing, and marketing), negligence, negligent misrepresentation, fraudulent misrepresentation, fraud by non-disclosure, breach of warranty, violations of the Texas Deceptive Trade Practices Act, bystander liability, and exemplary or punitive damage. Plaintiffs seek all available damages, including general damages, special damages, attorneys' fees, costs of suit, prejudgment interest, and post judgment interest.

    B.    <u>Defendant:</u>

Defendant Wing Enterprises, Inc. is a well-established manufacturer of ladders, with over forty (40) years of experience in the industry. Defendant has been designing and manufacturing ladders

per the applicable standards and practices in the industry, and has complied with the same for the manufacturing of the subject ladder. Wing Enterprises has sold over 20 million ladders.

The American National Standards Institute (ANSI), and the U.S. Department of Labor Occupational Health and Safety Administration (OSHA) govern any specifications, performance testing, and dimensional criteria for evaluation of a ladder design. Defendant has complied with all the above, and is a manufacturer and distributor of ladders in the United States and worldwide.

The subject ladder was manufactured in October 2016. The ladder was used on a daily basis, and shows signs of severe use and misuse, with different components of the ladder broken, bent, or missing, at the time of the accident. Specifically, per examination of the ladder, it was noted that any and all warning labels are missing or are illegible; the back braces show evidence of fracture and disconnection prior to the accident; the Rock Lock castings showed fractures as the result of significant non-climbing forces being applied; and the ladder rungs were missing components, and were found deformed and damaged, conditions which existed prior to the incident.

Defendant's experts will testify and show to the jury that:
- The subject ladder was not defective in design, manufacture, or warnings.
- The design met the specifications and performance requirements set forth by the applicable standards.
- The subject ladder has clear evidence of prior misuse and abuse that had permanently damaged the ladder.
- The ladder should have been taken out of service before the day of the subject incident, as a reasonably attentive user would have done.
- The incident was not initiated as a result of a Rock Lock pin disengagement.

Furthermore, although Defendant previously conducted voluntary recalls in other ladders, the same recalls do not apply for this ladder, which has a different design, and different locking mechanisms and any relation to the same is improper in this matter.

**5.    A Statement of Stipulated Facts:**

   A. The accident ladder was a Little Giant, Xtreme M22 ladder.

   B. Wing Enterprises designed, distributed, and sold a 22-foot multi-purpose ladder (Part Number 2322-801, Model Number 22) Wing Second Amd Ans, at ¶4.

   C. Wing Enterprises, Inc. markets its ladders to do-it-yourselfers and/or professionals. Wing Second Amd Ans, at ¶7.

   D. During the relevant time for the Thompson's purchase, Wing Enterprises website stated: "In the 1970s, Harold "Hal" Wing, met a German painter who had an interesting idea and a primitive prototype of a new kind of ladder. Hal enhanced the ladder and engineered what is now known as the strongest, safest, most versatile ladder in the world – the Little Giant Ladder System. This professional-grade, multi-use ladder system can be set up in different positions and is probably the most famous ladder in the world. Hal performed demonstrations of the ladder nationwide at state fairs and

9

    trade shows, building and packaging orders out of his garage. Working side-by-side with his wife Brigitte and their seven children, Hal built Little Giant Ladder Systems® on a foundation of quality and innovation. Gradually, both the do-it-yourselfers and professionals began to understand the Little Giant Ladder System was the best ladder in the world." Wing Second Amd Ans, at ¶7.

E.    The accident ladder was made in the second week of October 2016 at the Suzhou Zhongchuang Aluminum Products Co., Ltd. in Suzhou China (a/k/a Zcal) for Wing Enterprises, Inc.. Wing Second Amd Ans, at ¶27.

F.    Scott. and Dusti Thompson ordered the accident ladder on February 1, 2017. Wing Second Amd Ans, at ¶27.

G.    On December 29, 2019, Dusti and Scott Thompson were at a client's home located at 6929 Rocky Top Circle, Dallas, Texas 75252 to remove Christmas lights from the exterior of the home. Wing Second Amd Ans, at ¶31.

H.    Wing Enterprises, Inc. represented to consumers that the Xtreme M22 model ladder was safe and stable as manufactured and designed and sold by Wing Enterprises, Inc. Wing Second Amd Ans, at ¶56.

I.    Wing Enterprises admits that its sales and marketing language referred to the Little Giant Ladder System was a safe ladder system and/or words to that effect. Wing Second Amd Ans, at ¶63.

J.    Plaintiffs presented their claims to Wing and notified Wing of Wing's breaches of warranty on May 5, 2020, March 12, 2021, and January 22, 2024.

**6.    A List of Contested Issues of Fact:**

    A.    <u>Plaintiff:</u>

To the extent that any contested issue of law is properly considered as a contested issue of fact, Plaintiffs hereby incorporate such contested issue of law as a contested issue of fact.

> *Strict liability*
> 1.    Was there a design defect in the Ladder at the time it left Wing's possession that was the producing cause of the death of Scott Thompson and Plaintiffs' injuries and damages?
> 2.    Was there manufacturing defect in the Ladder at the time it left Wing's possession that was the producing cause of the death of Scott Thompson and Plaintiffs' injuries and damages?
> 3.    Was there a marketing defect in the Ladder at the time it left Wing's possession that was the producing cause of the death of Scott Thompson and Plaintiffs' injuries and damages?
> 4.    What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Scott Thompson for his injuries and damages, Dusti Thompson

for her damages, and Kaitlyn Thompson for her injuries and damages, if any, that resulted from such defect, including damages sustained in the past; and that, in reasonable probability, will be sustained in the future?

*Product-distributor liability*
5. Did Wing participate in the design of the Ladder?
6. Did Wing exercise substantial control over the content of a warning or instruction that accompanied the Ladder?
7. Was the warning or instruction the accompany the Ladder inadequate?
8. Did Scott Thompson's fall, and the harm to the Plaintiffs, result from the inadequacy of the warning or instruction?
9. Did Wing make an express factual representation about an aspect of the Ladder that was incorrect?
10. Did Scott Thompson rely on the representation in obtaining or using the product?
11. Did Dusti Thompson rely on the representation in obtaining or using the product?
12. If the Ladder had been as Wing represented, would Scott Thompson have died?
13. Did Wing actually know of a defect to the Ladder at the time the Wing supplied the Ladder to the Thompsons and did Scott Thompson's death result from the defects?
14. Did Wing know or should they have known about the defects or potential defects in the Ladder?
15. Did Wing actually know of a defect to the Ladder at the time that Wing supplied the Ladder to the Thompsons and did Scott Thompson's death result from the defect?
16. Did Wing know or should it have known about the defects or potential defects in the Ladder?

*Negligence*
17. Did the negligence of Wing proximately cause the death of Scott Thompson and the injuries and damages to the Plaintiffs?
18. What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Scott Thompson for his injuries and damages, Dusti Thompson for her injuries and damages, and Kaitlyn Thompson for her injuries and damages, if any, that resulted from such negligence, including damages sustained in the past; and that, in reasonable probability, will be sustained in the future?

*Fraud*
19. Did Wing commit common-law fraud on Scott Thompson?
20. Did Wing commit common-law fraud on Dusti Thompson?
21. Did Wing commit fraud by nondisclosure on Scott Thompson?
22. Did Wing commit fraud by nondisclosure on Dusti Thompson?
23. What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Scott Thompson for his injuries and damages, Dusti Thompson for her injuries and damages, and Kaitlyn Thompson for her injuries and

damages, if any, that resulted from or that were proximately caused by such fraud, including damages sustained in the past; and that, in reasonable probability, will be sustained in the future?

*Negligent misrepresentation.*
24. Did Wing make a negligent misrepresentation upon which Scott Thompson justifiably relied?
25. Did Wing make a negligent misrepresentation upon which Dusti Thompson justifiably relied?
26. What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Scott Thompson for his damages, if any, that were proximately caused by such negligent misrepresentation, including damages sustained in the past; and that, in reasonable probability, will be sustained in the future?
27. What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Dusti Thompson for his damages, if any, that were proximately caused by such negligent misrepresentation, including damages sustained in the past; and that, in reasonable probability, will be sustained in the future?

*Breach of warranty*
28. Did the Thompsons's Ladder fail to comply with an affirmation or promise made by Wing that Scott Thompson relied upon and that became a part of the bargain in purchasing the ladder and that this failure to comply proximately caused the death of Scott Thompson and Plaintiffs' injuries and damages?
29. Did the Thompsons's ladder fail to comply with an affirmation or promise made by Wing that Dusti Thompson relied upon and that became a part of the bargain in purchasing the ladder and that this failure to comply proximately caused the death of Scott Thompson and Plaintiffs' injuries and damages?
30. Did Wing sell an unmerchantable ladder to the Thompsons that was the proximate cause of Scott Thompson's death and Plaintiffs' injuries and damage; and did Dust Thompson put Wing on notice of Wing's breach?
31. Did Wing sell a ladder that was not fit for its particular purpose to the Thompsons that was the proximate cause of Scott Thompson's death and Plaintiffs' injuries and damage; and that Dusti Thompson put Wing on notice of Wing's breach?
32. What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Scott Thompson for his injuries and damages, Dusti Thompson for her injuries and damages, and Kaitlyn Thompson for her injuries and damages, if any, that resulted from any breach of warranty, including without limitation, damages sustained in the past and the damages that, in reasonable probability, will be sustained in the future?

*DTPA*
33. Did Wing engage in any false, misleading, or deceptive act or practice that Scott Thompson relied on to his detriment and that was a producing cause

12

of the death of Scott Thompson and Plaintiffs' injuries and damages, including without limitation by representing that goods had or would have characteristics that they did not have; representing that goods are or will be of a particular quality if they were of another; or failing to disclose information about goods that was known at the time of the transaction with the intention to induce Scott Thompson into a transaction he otherwise would not have entered into if the information had been disclosed; failing to comply with a warranty; failing to comply with an express warranty; furnishing goods that, because of a lack of something necessary for adequacy, were not fit for the ordinary purposes for which such goods are used; and furnishing or selecting goods that were not suitable for a particular purpose?

34. Did Wing engage in any false, misleading, or deceptive act or practice that Dusti Thompson relied on to her detriment and that was a producing cause of the death of Scott Thompson and Plaintiffs' injuries and damages, including without limitation by representing that goods had or would have characteristics that they did not have; representing that goods are or will be of a particular quality if they were of another; or failing to disclose information about goods that was known at the time of the transaction with the intention to induce Dusti Thompson into a transaction she otherwise would not have entered into if the information had been disclosed; failing to comply with a warranty; failing to comply with an express warranty; furnishing goods that, because of a lack of something necessary for adequacy, were not fit for the ordinary purposes for which such goods are used; and furnishing or selecting goods that were not suitable for a particular purpose?

35. What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Scott Thompson for his injuries and damages, Dusti Thompson for her injuries and damages, and Kaitlyn Thompson for her injuries and damages, if any, that resulted from any false, misleading, or deceptive act or practice, including without limitation, damages sustained in the past and the damages that, in reasonable probability, will be sustained in the future?

36. Did Wing engage in any false, misleading, or deceptive act or practice knowingly or intentionally?

*Bystander liability*

37. Did Dusti Thompson, who was the spouse of Scott Thompson, suffer emotional distress and mental anguish as a direct result of perceiving Scott Thompson's injury and eventual death because she was present at the time of the incident?

38. What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Dusti Thompson for her injuries and damages, if any, that resulted from or that were proximately caused by her perceiving the incident, including damages sustained in the past; and that, in reasonable probability, will be sustained in the future?

*Survival damages*

39. What sum of money would have fairly and reasonably compensated Scott Thompson for his pain and mental anguish, medical expenses, and funeral and burial expenses?

*Wrongful-death damages*

40. What sum of money, if paid now in cash, would fairly and reasonably compensate Dusti Thompson for her injuries and damages, if any, resulting from the death of Scott Thompson, considering pecuniary loss sustained in the past, pecuniary loss that, in reasonable probability, will be sustained in the future, loss of companionship and society sustained in the past, loss of companionship and society that, in reasonable probability, will be sustained in the future, mental anguish sustained in the past, mental anguish that, in reasonable probability, will be sustained in the future, and loss of inheritance?

41. What sum of money, if paid now in cash, would fairly and reasonably compensate Kaitlyn Thompson for her injuries and damages, if any, resulting from the death of Scott Thompson, considering pecuniary loss sustained in the past; pecuniary loss that, in reasonable probability, she will sustain in the future; loss of companionship and society sustained in the past; loss of companionship and society that, in reasonable probability will be sustained in the future; mental anguish sustained in the past; mental anguish that, in reasonable probability will be sustained in the future; and loss of inheritance.

*Punitive damages*

42. Was Wing's conduct grossly negligence as proven by clear and convincing evidence?
43. Did Wing procure a document by fraud?
44. What sum of money, if any, should be assessed against Wing and awarded to Scott Thompson, Dusti Thompson, and Kaitlyn Thompson as exemplary damages for Wing's conduct, considering the nature of the wrong, the character of the conduct involved, the degree of culpability of the wrongdoer, the situation and sensibilities of the parties concerned, the extent to which such conduct offends a public sense of justice and propriety, and the net worth of Wing?

*Attorneys' fees*

45. What is a reasonable fee for the necessary legal services of Plaintiffs' attorney for the breach of express warranty, breach of implied warranty, and DTPA claims to present them to the trial court, the court of appeals, the Texas Supreme Court, and the United States Supreme Court?

B. <u>Defendant:</u>

1. Did Scott Thompson use the incident ladder without regard to the labels and instructions and in violation thereto?

14

    2. On the day of the accident, was Scott Thompson using a ladder that had previously been damaged?
    3. Did Scott Thompson fail to remove the damaged ladder from service as a reasonable prudent user would have done?

**7.**     **A List of Contested Issues of Law:**

    A.     <u>Plaintiffs:</u>

To the extent that any contested issue of law is properly considered as a contested issue of fact, Plaintiffs hereby incorporate such contested issue of law as a contested issue of fact.

    1.     Did Wing's general denial of conditions precedent suffice to put any specific condition precedent into issue? *L.A. Public Ins. Adjusters v. Nelson*, 17 F.4th 521, 526 (5th Cir. 2021).

    B.     <u>Defendant:</u>

    1.     Are the 2012 recall of the Switch-It and the 2017 recall of the Velocity, LT and Liberty ladders related to the Xtreme model ladder that plaintiff purchased?
    2.     Has the Plaintiff presented facts that would entitle her to punitive damages?

**8.**     **An Estimate of the Length of Trial:**

The parties estimate that trial will last approximately 6-8 trial days.

**9.**     **list of any additional matters that might aid in the disposition of the case:**

    A.     <u>Plaintiffs:</u> Plaintiffs believe that referral to the Magistrate for a Magistrate-led settlement conference would be beneficial. Previous settlement efforts, including private mediation, have not resulted in any meaningful progress towards settlement. Defendant has a 3-company insurance ladder, and Plaintiffs respectfully request that representatives from all three insurers be compelled to attend the settlement conference in person.

    B.     <u>Defendant:</u>

**10.**     **Witness list:**

    A.     <u>Plaintiffs:</u>  See Exhibit A.

    B.     <u>Defendant:</u> See Exhibit B.

11. **Exhibit lists:**

    A.    <u>Plaintiffs:</u> See Exhibit C.

    B.    <u>Defendant:</u> See Exhibit D.

12. **Deposition designations:**

    A.    <u>Plaintiffs:</u> See Exhibit E.

    B.    <u>Defendant:</u> See Exhibit F.

13. **Proposed Voir Dire Questions:**

    A.    <u>Plaintiffs:</u> See Exhibit G.

    B.    <u>Defendant:</u> None.

14. **Proposed Jury Instructions:**

    A.    <u>Plaintiffs:</u> See Exhibit H.

    B.    <u>Defendant:</u> None.


<u>*/s/ Ross Cunningham*</u>
M. Ross Cunningham
Joseph Alexander
F. David Denny
Cunningham Swaim, LLP
4015 Main Street, Suite 200
Dallas, Texas 75226
Telephone:   (214) 646-1495
Facsimile:   (214) 613-1163

-AND-

<u>*/s/ Carlos Balido*</u>
Carlos Balido
Anastasia Triantafillis
Walters, Balido, & Crain
10440 North Central Expressway, Suite 1500
Dallas, Texas 75231
Direct Telephone: (214) 204-2266
Main Telephone: (214) 204-2100

SO ORDERED on this _____ day of February, 2024.

_____
The Honorable Sam A. Lindsay
Judge Presiding